UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SHANNON LEA MARTIN,  }<br>  }<br>　　Plaintiff,　　}<br>  }<br>v.　　　　　　　　}<br>  }<br>ELIJAH T. BRIGHAM and STEPHEN  }<br>EASON,　　　　}<br>  }<br>　　Defendants.　　} | Case No.: 2:18-CV-2010-RDP |

**MEMORANDUM OPINION**

This case is before the court on Defendants Elijah T. Brigham and Stephen Eason's Motion for Summary Judgment under Federal Rule of Civil Procedure 56. (Doc. # 18). The Motion is fully briefed (Docs. # 20, 23, 24) and is ripe for decision. After careful review, and for the reasons explained below, Defendant's Motion (Doc. # 18) is due to be granted.

**I.　Background**

On January 15, 2017, Plaintiff Shannon Lea Martin was arrested by two Gardendale Police Officers, Elijah Brigham and Stephen Eason (collectively, "Defendants"), for driving under the influence of alcohol. (Doc. # 1 at ¶¶ 2-3; Doc. # 5-1). Plaintiff alleges that she was sitting in a parked vehicle at 3:00 am behind a jewelry store adjusting her clothing when Brigham approached her car and demanded she take a breathalyzer test and walk in a straight line. (*Id*. at ¶¶ 4-5). As Brigham attempted to administer a field sobriety test to Plaintiff, Eason arrived on the scene. (Doc. # 19-3 at 9-10). Plaintiff refused to submit to the testing. She declined to take a "balance and field

sobriety test," claiming that she had "a problem with balance anyway"[1] and refused the breathalyzer because she has always been told not to take a breathalyzer because you don't know when they have been calibrated." (Doc. # 19-1 at 8). Upon Plaintiff's refusal, Brigham placed her under arrest. After some initial non-compliance, she was placed in handcuffs and put her in the back of his patrol car. (Doc. # 1 at ¶ 6). Plaintiff alleges that while she was sitting in the back of the patrol car, the handcuffs came off her right hand. (*Id*. at ¶¶ 7-8). She asserts that she made no attempt to resist or escape but raised her right hand to inform Defendants that the handcuff had come off. (*Id*. at ¶ 8). According to Plaintiff, Brigham grabbed her by the arm, pulled her out of the patrol car in a standing position, and "slammed [her] head into the door frame of the car severely injuring her left eye." (*Id*. at ¶¶ 10-12). Plaintiff further contends that both Defendants "seized [her] and shoved [her] into the ground slamming her into the pavement of the parking lot." (*Id*. at ¶ 13). She also contends that Defendants reapplied the handcuffs while her stomach was pressed to the pavement. (*Id*. at ¶ 14). Finally, Plaintiff alleges that before she was taken to the Gardendale Jail, the Gardendale Police Department transported her to UAB Hospital to receive treatment for her injuries. (*Id*. at ¶ 17). On April 21, 2017, the Gardendale Municipal Court found Plaintiff guilty of driving under the influence. (Doc. # 5-1 at 3). Plaintiff has appealed that conviction. (*Id.* at 1-2).

Plaintiff initially raised two claims against Defendants under 42 U.S.C. § 1983. First, she claims that while acting under color of law, Defendants violated her constitutional right to be free from the use of excessive or unreasonable force during an arrest. (*Id*. at ¶¶ 19-24). Second, she asserts that Defendants "intentionally committed acts that violated [her] constitutional right not to

---

[1] Plaintiff acknowledges that she had been taking Topamax on the day at issue, which is used as a preventative migraine treatment, and this medication, Plaintiff alleges, can cause issues with balance as well. (Doc. # 19-1 at 11). Whether Plaintiff was aware of the potential side effects of mixing Topamax with alcohol, with respect to her ability to balance, is a question not presently before the court.

2

be arrested without probable cause . . . by arresting [her] without probable cause." (*Id*. at ¶¶ 25-29). On February 12, 2019, this court dismissed without prejudice Plaintiff's claim for unlawful arrest on the basis of *Younger* abstention. (Doc. # 14). Consequently, Plaintiff's only remaining claim, and the one addressed in this Memorandum Opinion, is her excessive force claim

## II.     Standard of Review

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for

summary judgment.").

## B. The Law Related to Use of Excessive Force Claims

The Supreme Court has instructed that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396; *Landsman v. City of Vero Beach*, 621 F. App'x 559, 562 (11th Cir. 2015) ("Whether a specific use of force is excessive turns on factors such as the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing." (citation omitted)); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) ("To come within the narrow exception, a plaintiff must show that the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'").

The overarching inquiry is "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). However, "the use of force against an arrestee who, *inter alia,* is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive." *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016).

## C. The Law Related to Qualified Immunity

"The doctrine of qualified immunity protects government officials [sued in their individual

capacity] 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Nelson v. Lott*, 330 F. Supp. 3d 1314, 1327 (N.D. Ala. 2018). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)). However, the protections of qualified immunity do not apply to those officials "who knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Nelson*, 330 F. Supp. 3d at 1327 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

In order to properly analyze a defense of qualified immunity, the Supreme Court set out a two-part framework. First, the court asks if the plaintiff has "sufficiently alleged a constitutional or statutory violation." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009). "Without a . . . violation, there can be no violation of a clearly established right." *Mann*, 588 F.3d at 1305. Second, the court must determine "whether the constitutional violation was 'clearly established' on the date of the event leading to suit. The focus at this step of the analysis is on the question of whether the officer had 'fair notice' that his conduct was unlawful." *Nelson*, 330 F. Supp. 3d at 1330.

While "exact factual identity with a previously decided case is not required, . . . the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). "A court looks only to binding precedent—cases from the United

States Supreme Court, the [pertinent] Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." *Id.* at 1013.

## III. Analysis

Defendants argue that they are entitled to qualified immunity on Plaintiff's excessive force claim because (1) they did not violate Plaintiff's constitutional rights, or alternatively, (2) the constitutional right Plaintiff claims was violated was not clearly established at the time of the events at issue in this case. (Doc. # 20 at 8-9). After careful review, the court concludes that Defendants are entitled to qualified immunity.

### A. Defendants Brigham and Eason Are Entitled to Qualified Immunity Based Upon the Undisputed Facts in this Case

In many instances, when addressing a qualified immunity motion involving an interaction between law enforcement and an arrestee, the court is left with the task of navigating through the testimony of the parties as to what occurred. With the advent of body cameras, more and more often, the court has the benefit of a video recording of the events at issue. That is the case here.

#### 1. The Video Evidence

The court has had the opportunity to repeatedly observe a video depicting what occurred in this case. (Doc. # 19) (Brigham's Body Camera Video Recording, filed July 11, 2019) (cited in this Opinion as "Video Footage").[2] No party has disputed the authenticity of the video, nor do they contend the video does not accurately depict the events leading up to Plaintiff's arrest and claim

---

[2] Where appropriate, the court has cited to the time stamp on the video where the event can be reviewed.

7

in this case.³ A review of that evidence⁴ shows that, throughout the entire encounter with Plaintiff, Brigham conducted himself in a professional manner. Brigham first approached Plaintiff's parked car at approximately 3:00 am. (Video Footage at 0:01). When Brigham asked her what she was doing in the parking lot, Brigham smelled alcohol on her breath. (Video Footage at 17:04). Plaintiff explained to Brigham that she had stopped her car to put on her bra before going to a Waffle House. (Video Footage at 2:46). Brigham asked her whether she had been drinking alcohol that evening, and if so, how much. Plaintiff initially stated that she had "a few" drinks. (Video Footage at 1:48). Later, she stated that she had a "couple." (Video Footage at 13:19). Eventually, she confessed that she had consumed approximately 4-5 drinks. (Video Footage at 17:42). Plaintiff also acknowledged (after some banter) that she had previously been arrested for a DUI in 2010. (Video Footage at 12:05).

Due to the smell of alcohol on her breath and her slurred speech, Brigham asked Plaintiff to perform a field sobriety test. (Video Footage at 3:43). At some point thereafter, Eason arrived on the scene. (Video Footage at 7:48). One of the tests Brigham proposed was for Plaintiff to stand on one leg. (Video Footage at 5:05, 7:55). When Plaintiff refused (*see* Video Footage at 5:14, 8:00), indicating that she did not have good balance generally, Brigham asked her to walk a straight line (one that was marked in the parking lot). (Video Footage at 10:11). She refused to perform that test also (again citing her general lack of balance). (Video Footage at 10:13-16). Because Plaintiff would not comply with the administration of a field sobriety test, Brigham retrieved a breathalyzer from his patrol car. (Video Footage at 10:45). Plaintiff refused to submit to that as

---

³ That is not to say that Plaintiff's counsel and Plaintiff herself have not attempted to characterize the activity on the video. But, in the face of the straight-forward video evidence in this case, their characterizations are arguments, not factual assertions, and certainly not Rule 56 evidence.

⁴ The facts presented are gleaned from the testimonial evidence as well as the video recording taken on Brigham's body camera. The court has carefully reviewed this video footage.

well (*see* Video Footage at 11:05-06) and told Brigham that he was being an "ass." (Video Footage at 14:22).

When Brigham told Plaintiff that he was placing her under arrest, she replied "no" multiple times and attempted to walk away from him. (Video Footage at 18:02-20). He then took her arm in an effort to place her in handcuffs. She again resisted, this time by attempting to pull her arms away from him. (Video Footage at 18:30). Once Brigham told her that he would add resisting arrest to her charge, she began to comply and calmed down. (Video Footage at 18:19-35).

Brigham placed Plaintiff in the back seat of his patrol car and then searched her car. (Video Footage at 19:25). He asked Eason to keep an eye on Plaintiff to make sure she did not try to kick out his window. (Video Footage at 19:36). Brigham found numerous empty prescription bottles in Plaintiff's car. (Video Footage at 20:07-17). But his search was interrupted. Brigham was required to return to his patrol car when Eason informed him that Plaintiff had slipped out of her handcuffs. (Video Footage at 20:45). Brigham opened the car door and asked Plaintiff to exit the car. (Video Footage at 20:50). Once Plaintiff was out of the car, she attempted to walk away from Defendants. (Video Footage at 20:55). Brigham stated multiple times, "ma'am, stop fighting us." (Video Footage at 20:55-20:56). The video footage depicts Brigham holding Plaintiff's arm in an effort to restrain her. (Video Footage at 21:00-22:00). The next portion of the video is unclear to some degree. Either (1) Plaintiff, who had refused field sobriety tests due to her poor balance, lost her balance and went to the ground, or (2) the resistance used by one or both of the officers to Plaintiff's movement out of the car caused her to do so. (Video Footage at 20:57). What is clear is that she exited the car and went to the ground. The video footage does not depict precisely where Eason was in relation to Brigham or Plaintiff, but he testified (and it is not disputed by any record evidence) that he did not see Plaintiff fall. (Doc. # 19-3 at 15, 17). The video does not show Plaintiff

falling or where exactly she hit her head, but as soon as Plaintiff fell, Brigham said, "oh, oh," "are you okay"? (Video Footage at 20:58-59). He told Plaintiff that he did not see her fall, but that he heard it. (Video Footage at 21:56). The video ends with Brigham again asking Plaintiff if she is okay. (Video Footage at 21:19; 22:15-20).

### 2. Brigham and Eason Were Acting Within the Scope of Their Discretionary Authority

Both Brigham and Eason were acting within the scope of their discretionary authority when they arrested Plaintiff. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002) (concluding that "an officer acts within the scope of his discretionary authority when he arrests and transports a subject to jail"). The question here thus turns to whether, in viewing the facts in the light most favorable to the non-moving party, Plaintiff sufficiently alleged a constitutional violation on the part of Defendants Brigham and Eason. "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Id.* at 1346; *Chaney v. City of Orlando, Fla.*, 291 F. App'x 238, 243 (11th Cir. 2008).

### 3. Brigham and Eason Did Not Violate Plaintiff's Constitutional Rights

Where, as here, Defendants demonstrate that they were acting within the scope of the discretionary authority, the court's analysis turns to the remaining elements of qualified immunity: (1) whether there is a violation of the plaintiff's constitutional rights, and (2) whether that right was clearly established at the time of the alleged violation at issue. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

"In addressing an excessive force claim brought under § 1983, the proper analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of

force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Generally, the infringed constitutional right will either fall under the Fourth Amendment or the Eighth Amendment. *Id.* at 394. Here, Plaintiff brings her claims under the Fourth Amendment. (Doc. # 1 at 1). As noted by the Supreme Court, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Determining whether an action is reasonable under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Of course, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (citation omitted); *Copeny v. Prosser*, Case No: 5:16-cv-00865-KOB-SGC, 2018 WL 5602902, at *10 (N.D. Ala. Aug. 10, 2018) ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."). Police officers must be given discretion in situations that are "tense, uncertain, and rapidly evolving," to determine "the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. Ultimately, "[o]fficial action constitutes excessive force when it is objectively unreasonable." *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017). Here, the court finds that Brigham's and Eason's actions, under the totality of the circumstances, were not objectively unreasonable.

There is no Rule 56 evidence suggesting that Brigham or Eason used excessive force against Plaintiff. Indeed, the undisputed record evidence -- particularly the video evidence -- shows that both Defendants acted in an objectively reasonable manner. With respect to Brigham, Plaintiff

11

characterizes what occurred during the incident: she was "jerked . . . out" of the car by her arm, she was "pulled out" and "stood up," she "hit [her] head" and was taken to the ground. (Doc. # 19-1 at 9, 10-11). However, the objective video footage shows that what actually occurred is, at most, the type of pushing and shoving that might seem unnecessary in the peaceful sanction of the judicial chambers but simply does not violate an arrestee's constitutional rights. The video shows that Plaintiff slipped out of her handcuffs (whether based on her own efforts or because they were not secure). When this came to Eason's attention, he notified Brigham. The officers then opened the door and asked Plaintiff to exit the car. The video does not support the inference that Brigham used more force than was objectively necessary. In fact, the video footage shows that while Plaintiff was largely uncooperative and noncompliant with Brigham throughout the entire arrest, he was patient and solicitous toward her. The video jumps around at the point Plaintiff exits the car, but once Plaintiff exits the car, Brigham says repeatedly "stop fighting us." When Plaintiff went to the ground, she was crying and said "fuck you" to the officers. (Video Footage at 21:03). Brigham said "oooh" and asked if she was alright. Suffice it to say that even viewing the video and other Rule 56 evidence in the light most favorable to Plaintiff, there is not sufficient evidence from which a jury could conclude that Defendants used excessive force against Plaintiff. This is, at most, the type of pushing and shoving that is viewed differently in the quiet confines of a district judge's chambers, but it is not an objectively unreasonable use of force. *Graham*, 490 U.S. at 396.

The Eleventh Circuit has held that "a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014). Here, the video objectively shows that Plaintiff resisted arrest by Brigham multiple times; she refused to obey commands; and Brigham used no gratuitous or excessive force

against Plaintiff. Viewing the record facts here in the light most favorable to Plaintiff, a reasonable factfinder could only conclude that Brigham acted in an objectively reasonable manner under the standard set forth in *Saunders*.

With respect to Eason, in her deposition, Plaintiff was asked: "In having the benefit of re-watching portion[s] of the video, are you aware of anything that Officer Eason did that caused you to injure yourself? . . . Can you tell me what [Officer Eason] did versus what Officer Brigham did?" (Doc.# 19-1 at 24). Plaintiff responded: "It was both officers that were a part of it. . . . It was two officers that took me to the ground." (Doc. # 19-1 at 24). This is the only instance where Plaintiff suggests that Eason acted unlawfully; however, she has wholly failed to specify what Eason did (apart from generally asserting that two officers took her to the ground), and the Rule 56 evidence does not support the inference that he used any force against Plaintiff, much less excessive force.

Consequently, viewing the record evidence in the light most favorable to Plaintiff, the court cannot conclude that Brigham or Eason violated Plaintiff's Fourth Amendment rights by using excessive force.[5] Their conduct was "objectively reasonable." *Dukes*, 852 F.3d at 1042.

### 4. Defendants Did Not Violate Any of Plaintiff's Cleary Established Rights

Even if Plaintiff had sufficiently established that Brigham and Eason violated her constitutional rights (and, to be clear, she has not), Plaintiff has not shown that the law at the time of the event was so clear as to put Brigham and Eason on notice that their particular conduct -- as

---

[5] Additionally, there is no Rule 56 evidence indicating that Brigham or Eason even saw how Plaintiff fell. Brigham told Plaintiff in the video that he did not see her fall but that he heard it. Similarly, Eason explained that "as [Plaintiff] was turning to the left, I let go of her arm. . . . [and then] I heard a thud. I turned around and she was laying on the ground." (Doc. # 19-3 at 15-16). Eason went on to state that he did not see Plaintiff's head strike the vehicle, and also that he was essentially blocked from view because he was "directly behind [Brigham]" when she fell. (Doc. # 19-1 at 16). Plaintiff has not presented any evidence which contradicts that testimony.

slight as it may have been in this situation -- was unlawful. *Pearson*, 555 U.S. at 244 ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002))).

> In a claim of excessive force, there are two ways to . . . show that the law clearly established that the particular amount of force use was excessive. The first of those ways is to show that, in a materially similar factual situation, the law has held that the officer's conduct was unlawful. Where the case law is not materially similar, we look to the second way and consider whether other case law has provided sufficient notice to "every" reasonable officer that such force is unlawful.

*Chaney*, 291 F. App'x at 243-44 (citing *Lee v. Ferraro,* 284 F.3d 1188, 1198 (11th Cir. 2002)) (citations omitted).

Here, Plaintiff cites to *Saunders* and *Vinyard* in support of her argument that the law at the time of her arrest put Brigham and Eason on notice that their particular conduct was unlawful. However, neither case has the factual similarity necessary to put Brigham and Eason on notice that their conduct was unlawful. *Saunders* involved a defendant who was involved in the illegal sale of narcotics. 766 F.3d at 1265. The defendant was caught by the police at a gas station and told to place his hands on the windshield of a car, which he did without hesitation or resistance. *Id.* The police then "jerked" him "out of the vehicle and pushed him down on the hot pavement in order to handcuff him." *Id.* As stated by the court:

> After he was handcuffed, Mr. Saunders was held down against the hot pavement on his stomach for a "long period of time," though he was "not resisting, posing [a] threat, or attempting to flee." He told the agents that he was "getting burnt." During this time Mr. Saunders "was holding his face up off the hot pavement to keep from being burn[ed]." Though he was not resisting or attempting to flee, one of the agents "slammed" Mr. Saunders' face onto the pavement "with extreme force."

*Id.* The court held that the police officers were not entitled to qualified immunity, stating: "[i]f these allegations are true, and we must assume that they are at this stage of the case, that force was unnecessary, disproportionate, and constitutionally excessive." *Id.*

Here, the facts involving Brigham and Eason are nowhere near as egregious as those at issue in *Saunders*. To the contrary (and again), the record indicates that Plaintiff was approached by Brigham at 3:00 am while putting on her bra in a dimly lit parking lot, refused to take a field sobriety test, admitted to having had a "few drinks" that night, resisted arrest, came out of one handcuff while in the back of the police cruiser, and while exiting the patrol car went to the ground, hitting her head against the car. (*See generally* Docs. # 19-1l; 19-2; 19-3). There is no evidence indicating that Brigham or Eason used excessive force that caused Plaintiff to fall.

Brigham stated in his Declaration that while he was trying to reapply Plaintiff's handcuffs:

> She tried to move away from us and into the open area of the parking lot. I held onto her left arm, but she continued to try to pull away in what seemed to be an effort to flee. Because of [Plaintiff's] unwillingness to allow her hands to be cuffed behind her back, I wanted to turn her back towards the direction of the car, whereby I could pin her against it and more easily secure her handcuffs. In the process of turning [Plaintiff] back towards my patrol car, however, she lost her balance and fell, hitting her head on a portion of the car.

(Doc. # 19-4 at 3). *Saunders* does not stand for the proposition that holding onto Plaintiff's arms to prevent her from running away constitutes excessive force.

Eason testified that for the majority of the time he was on the scene, he watched Plaintiff while she was in the back seat of Brigham's patrol car because he was asked to do so. (Doc. # 19-3 at 11-12). When Plaintiff exited the patrol car, he took her wrist to reattach the handcuff but was unable to observe Brigham's conduct because Plaintiff was blocking his view. (*Id.* at 15). When Plaintiff began walking away, Eason "let go of her arm," and then "heard a thud." (*Id.* at 15-16). He then stepped to where she was on the ground and "grabbed her left arm . . . and put the handcuff on it." (*Id.* at 17). The conduct in *Saunders* was significantly more egregious. Indeed, there is simply no Rule 56 evidence in this case showing conduct even approaching the level of the police officer's conduct in *Saunders*. Because the factual dissimilarities of the two cases, *Saunders* could

15

not have placed Brigham and Eason on notice that their conduct was unlawful.

Plaintiff also cites to *Vinyard* as support for her contention that Brigham and Eason were put on notice that the force they used was excessive. But *Vinyard* is so dissimilar to the instant case that Plaintiff's reliance on it is disingenuous. In *Vinyard*, the relevant facts were as follows:

> According to Vinyard [the plaintiff], Stanfield [the defendant officer] . . . informed her that "[y]ou're a drunk, always have been, and always will be. You are one drunken, skanky whore." Stanfield then told Vinyard that she did not deserve her children, and that Stanfield also was "not worried about [Vinyard's] . . . bastard son." After these remarks, Vinyard cursed Stanfield. Vinyard admits that she "got mad" and "started screaming" at Stanfield.
>
> About one-fourth or one-half mile from the party and during Vinyard's verbal tirade, Officer Stanfield pulled his patrol car to the side of the dark, secluded road, stopped the car, got out, and stepped back to Vinyard's door and opened the door. Vinyard was scared and "did not know what Stanfield was going to do." Vinyard saw that Stanfield had something in his hand when he opened the door, and she ducked to the right. According to Vinyard, Stanfield grabbed Vinyard's arm, bruising her arm and breast. He then apparently let go of her arm, pulled Vinyard's head back by her hair and sprayed her in the face with two to three bursts of pepper spray. At all times Vinyard remained in the back seat and handcuffed behind her back with her feet on the floorboard.
>
> . . . .
>
> After bruising and pepper spraying Vinyard, Officer Stanfield then resumed driving Vinyard to the jail. . . . When Vinyard complained that she could not breathe, Stanfield said, "I hope you die, because when I get you to the jail I'm going to beat the shit out of you and there's nothing you can do." When Stanfield and Vinyard arrived at the jail, Stanfield dragged Vinyard inside, either by her shirt, her arm or her hair.

*Vinyard*, 311 F.3d at 1342-44. The court concluded (with good reason) that the defendant officer in *Vinyard* used excessive force. Here, however, neither Brigham nor Eason acted in a manner even remotely similar. To the contrary, Brigham and Eason were patient and solicitous, and neither Plaintiff -- who had admittedly poor balance -- somehow fell when exiting the vehicle. Brigham checked to see if she was injured and took her to UAB Hospital to be examined. Therefore, *Vinyard* is of no support to Plaintiff.

And even if the factual distinctions between the facts here and the two cases Plaintiff cited for support were not enough, there is *Chaney*. The Eleventh Circuit held in *Chaney* that the plaintiff in that case failed to show that the defendant violated "any clearly established right" (*i.e.*, that the defendant-officer was put on notice) because:

> There was no evidence . . . indicating that [the defendant's] conduct of physically grabbing [the plaintiff], pulling him out of his car, throwing him to the pavement, handcuffing him, using his Taser . . . , or putting his foot on [the plaintiff's] head was so obviously wrong that he would have known that it was unlawful.

*Chaney*, 291 F. App'x at 244. It follows that if the conduct catalogued in *Chaney* was not enough to violate a plaintiff's clearly established rights, then Brigham's and Eason's conduct, which is miniscule compared to that in *Chaney* (and *Vinyard* for that matter), cannot be said to clearly violate a clearly established right.

Viewing the facts in the light most favorable to Plaintiff, no reasonable finder of fact could conclude that Brigham and Eason violated her clearly established rights. They are each entitled to judgment as a matter of law.

## VI. Conclusion

The court concludes that Plaintiff has not satisfied her burden of proving that, under her version of the facts, Defendants Brigham and Eason violated her Fourth Amendment rights. Therefore, the court finds that both Defendants are entitled to qualified immunity. For the reasons discussed above, Defendant's Motion for Summary Judgment is due to be granted. An order consistent with this Memorandum Opinion will follow.

**DONE** and **ORDERED** this October 11, 2019.

*[signature]*

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE